IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 25, 2005

## STATE OF TENNESSEE v. RONALD ALLEN

**Appeal from the Criminal Court for Washington County**
**No. 27518     Lynn W. Brown, Judge**

_____

**No. E2004-01308-CCA-R3-CD - Filed March 17, 2005**

_____

The defendant, Ronald Allen, was convicted of rape of a child. The trial court imposed a sentence of twenty-five years. In this appeal, he asserts (1) that the evidence is insufficient; (2) that the trial court erred by permitting the state to ask leading questions of the minor victim; (3) that the sentence is excessive under the terms of the 1989 Sentencing Act; and (4) that the sentence must be modified under the terms of Blakely v. Washington, 524 U.S. ___, 124 S. Ct. 2351 (2004). The sentence is modified to twenty-three years. Otherwise, the judgment is affirmed.

**Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed as Modified**

GARY R. WADE, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

Richard A. Spivey, Kingsport, Tennessee (on appeal), and Ivan Lilly, Assistant Public Defender (at trial), for the appellant, Ronald Allen.

Paul G. Summers, Attorney General & Reporter; Renee W. Turner, Assistant Attorney General; Joe Crumley, District Attorney General; and Janet Hardin, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In March of 2001, Investigator Brian Rice of the Johnson City Police Department responded to a report by the Department of Children's Services regarding allegations of sexual abuse of the four-year-old victim, D.R.[1] When Officer Rice attempted to interview the victim at the Johnson City Pediatric Clinic, however, she was very timid and did not want to talk. Because there was no corroboration of the allegations, no charges were filed at that time. In early 2002, an investigation was opened when Officer Rice learned that the victim was suffering "medical problems" as a result of the alleged abuse. After receiving a letter from the victim's physician, Dr. Martin Olsen, and

---

[1]It is the policy of this court to identify minor victims of sexual crimes only by their initials.

taking a statement from the victim's aunt, Michelle Reed, Officer Rice interviewed the defendant. The defendant provided the following signed statement:

"I lived at 2207 Indian Ridge Road #8 with my girlfriend, Michelle Reed. Michelle's niece, [D.R.], would come over and stay with us at least once a week. [D.R.] was staying with us one night, and I woke up the next morning and made a pot of coffee. I drank one cup of coffee and went back to sleep. About nine o'clock that morning I woke up and had an erection. When I woke, [D.R.] was on top of me squirming. I had on underwear but my erect penis was coming out the top about an inch or two. [D.R.] had on a sleep shirt that was pulled up above her waist. I was laying on my back and [D.R.] was on top of me. I could tell that my penis was rubbing her vagina and may have went inside her barely, but no way it went far. When I was asleep my finger could have went inside her vagina because when I sleep I rub around on my girlfriend a lot. When I realized that she was on top of me, I slid her off to my left side. I know I did something with [D.R.] because she has genital warts just like me."

Prior to making the statement, the defendant signed a waiver of rights form. The interview, which lasted approximately forty-five minutes, was not videotaped. Afterward, the defendant was charged with rape of a child.

Michelle Reed, who had been living with the defendant for approximately five years at the time of the offense, testified that the victim spent nearly every weekend at her house during the spring of 2001. She recalled that in March of 2001, the victim was taken to the pediatrician by her mother, Roberta Reed, because she complained that she was "sore." According to Michelle Reed, the victim had spent the night with her and the defendant a couple of days before the doctor visit. She stated that during that time period, she observed genital warts on the defendant's penis. Michelle Reed testified that as a result of the victim's diagnosis, she confronted the defendant, who, after having denied the allegations for almost a year, finally acknowledged, "I can no longer fight these allegations [be]cause my test results came back and I'm positive for genital warts." She stated that the defendant admitted penetrating the victim's vagina with his penis, claiming that he had done so by accident. Michelle Reed described the defendant's demeanor as "humble [and] apologetic" but testified that he "was acting like [D.R.] did it to him."

Roberta Reed, the victim's mother, testified that she first took the victim to her pediatrician, Dr. Charles Fish, in March of 2001 and returned several months later when she noticed blood in the victim's panties. She recalled that the victim was referred to Dr. Martin Olsen, a gynecologist who eventually performed surgery. Roberta Reed stated that the victim, who had previously been very friendly, became "standoffish towards people," refused to leave her side, had nightmares, and did not want to be left alone in her room.

The victim, who was six years old at the time of trial, testified that the defendant hurt her when she spent the night at the residence he shared with her aunt and told her not to tell anyone. The victim said that she did not remember what the defendant had done to hurt her but could recall having to visit several doctors. She identified the defendant by his nickname, "Twin."

-2-

Dr. Charles Fish, who examined the victim in March of 2001, testified that the victim was "very defensive" about being examined in the genital area. He found that the victim's hymen was intact but observed that she had some "minimal irritation from the clitoris to the anterior edge of the hymen." In an examination eight months later, Dr. Fish discovered "a lesion on the left inner aspect of the vulva" which was "five . . . to six . . . millimeters in diameter elevated from the surface of the skin and slightly friable." Because that was uncommon in children, he referred the victim to Dr. Martin Olsen for a biopsy.

Dr. Martin Olsen, who examined the victim in November of 2001, observed a genital wart near her hymenal ring. At trial, he explained that genital warts are caused by a virus which is common in sexually active people, uncommon in children, and which can live in the skin without causing warts. It was his opinion that the wart discovered on the victim's genitalia was a "severe squamous dysplasia" which will require "constant medical care to make sure it doesn't turn into cancer." According to Dr. Olsen, the victim must have complete genital examinations every three months and, because she has an aversion to the examinations, general anesthesia will be required. It was Dr. Olsen's opinion that the victim contracted the disease through sexual contact. He testified that "something had to touch [the victim] at the location of the hymenal ring, so something passed the labia majora, passed the labia minora. . . . I guess [there is] a very small percent chance it could have been a finger, but much more likely an adult male penis."

The defendant testified that when Investigator Rice asked him to come to the police station he "basically . . . just cooperated with him" and signed the statement without having read it. While he claimed that the statement was not his, he acknowledged having told the officer that "something must have happened" because both he and the victim had genital warts. The defendant also denied admitting the abuse to the victim's aunt. When asked if he had ever penetrated the victim with his finger or his penis, the defendant responded, "To my knowledge, no. I would not do that intentionally to [D.R.]." He claimed that the victim's aunt lied about his having visually obvious genital warts and insisted that he was unaware of his infection until both he and the victim's aunt tested positive. The defendant maintained that his signing the statement written by Investigator Rice was "the biggest mistake of [his] life."

I

The defendant first asserts that the evidence is insufficient. On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal

defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

Rape of a child, a Class A felony, is defined as follows:

Rape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if such victim is less than thirteen (13) years of age.
Tenn. Code Ann. § 39-13-522(a). Sexual penetration is defined as:

sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required.
Tenn. Code Ann. § 39-13-501(7).

Here, the victim testified that the defendant hurt her and that, as a result, she had to see a lot of doctors. The victim's aunt testified that the victim spent the night at the residence she shared with the defendant nearly every weekend. The victim's mother testified that the victim complained of pain in her genital area and had to be taken to the doctor. Dr. Olsen testified that the victim had contracted genital warts and explained that she could only have contracted the disease through sexual contact. It was his opinion that the infection was caused by contact with an "adult penis." The defendant admitted to Investigator Rice that he penetrated the victim's vagina with his penis, but claimed that the contact was initiated by the four-year-old victim. At trial, the defendant denied admitting the penetration to Investigator Rice, claiming that he signed the statement without reading the content. There was no evidence that the victim had contracted the virus from any other source. The jury, as fact-finder, was free to accredit or reject any portion of each witness' testimony in reaching its conclusion. See Tenn. Const. art. I, § 19; Byrge, 575 S.W.2d at 295. Because a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, the evidence was legally sufficient to support the conviction. See Jackson v. Virginia, 443 U.S. 307 (1979).

II

The defendant next contends that the trial court erred by permitting the state to use leading questions during the direct examination of the victim. He also claims that the victim, because of her age, was incompetent to testify. In addition, he asserts that the trial court erred by asking the victim if she knew "where God is" when determining her competency to testify. Finally, he complains that the victim's testimony was irrelevant and that her mere presence as a witness was prejudicial.

The propriety, scope, manner and control of the examination of witnesses are within the sound discretion of the trial court. State v. Humphreys, 70 S.W.3d 752, 766-67 (Tenn. Crim. App. 2001). The ruling of the trial court in this regard will not be overturned absent an abuse of that discretion. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). "An abuse of discretion exists when the reviewing court is firmly convinced that the lower court has made a mistake in that it

affirmatively appears that the lower court's decision has no basis in law or in fact and is therefore arbitrary, illogical, or unconscionable." State v. Brown & Williamson Tobacco Corp., 18 S.W.3d 186, 191 (Tenn. 2000).

Rule 611 of the Tennessee Rules of Evidence vests the trial court with the discretionary authority to supervise the presentation of evidence. The rule specifically addresses leading questions:

> Leading questions should not be used on the direct examination of a witness except as may be necessary to develop testimony. Leading questions should be permitted on cross-examination. When a party calls a witness determined by the court to be a hostile witness, interrogation may be by leading questions.

Tenn. R. Evid. 611(c).

This court has long recognized that it is within the trial court's discretion to permit leading questions of child sex offense victims. See Swafford v. State, 529 S.W.2d 748, 749 (Tenn. Crim. App. 1975). Here, defense counsel objected to two of the state's questions as leading. The trial court overruled on each occasion. In our view, the record establishes that the questions were intended to develop the testimony of the child victim. While these questions may qualify as leading, they were not overly suggestive of the desired responses. See, e.g., State v. William Dearry, No. 03C01-9612-CC-00462 (Tenn. Crim. App., at Knoxville, Feb. 6, 1998) (permitting prosecutor to ask the child victim whether she had "touched [the defendant] with [her] mouth"). In consequence, this issue would not serve as a basis for relief.

The defendant also claims that the trial court erred by finding that the victim, age six at the time of trial, was competent to testify. Competency of a witness is controlled generally by Tennessee Rule of Evidence 601, which provides that "every person is presumed competent to be a witness except as otherwise provided in these rules or by statute." "Virtually all witnesses may be permitted to testify: children, mentally incompetent persons, convicted felons." Tenn. R. Evid. 601, Advisory Commission Comment. Tennessee Rule of Evidence 603 provides as follows:

> Before testifying, every witness shall be required to declare that the witness will testify truthfully by oath or affirmation, administered in a form calculated to awaken the witness's conscience and impress the witness's mind with the duty to do so.

Tenn. R. Evid. 603. The common law rule is that if the child "understands the nature and meaning of an oath, has the intelligence to understand the subject matter of the testimony, and is capable of relating the facts accurately," he or she is deemed competent to testify. State v. Ballard, 855 S.W.2d 557, 560 (Tenn. 1993); see also State v. Howard, 926 S.W.2d 579, 584 (Tenn. Crim. App. 1996), overruled on other grounds by State v. Williams, 977 S.W.2d 101 (Tenn. 1998); State v. Fears, 659 S.W.2d 370, 375 (Tenn. Crim. App. 1983).

Although the defense in this instance did not question the victim's competence to testify, the trial court inquired about her ability to understand the oath and appreciate its importance. The victim responded affirmatively when asked if she understood that she was "promising God that [she] was going to tell the truth in this proceeding." She also answered in the affirmative when the trial court asked if she "understood that [she] ha[d] promised to tell the truth." Upon reflection, the trial court ruled that the victim "under[stood] the nature and significance of the oath."

The determination of the competency of a minor witness is a matter properly within the discretion of the trial judge, who has the opportunity to observe the witness first-hand. The decision of a trial judge will not be overturned absent a showing of an abuse of that authority. State v. Caughron, 855 S.W.2d 526, 538 (Tenn. 1993); State v. Braggs, 604 S.W.2d 883, 885-86 (Tenn. Crim. App. 1980). In our view, the record demonstrates that the victim understood the nature of her oath. See Howard, 926 S.W.2d at 584; State v. Mack A. Atkins, No. 03C01- 9208-CR-00285 (Tenn. Crim. App., at Knoxville, June 17, 1993) (holding that trial court properly found six-year-old witness competent to testify at trial). While the trial court should have conducted a jury-out hearing to determine the victim's competency to testify, see Tenn. R. Evid. 104(c), the victim established her competency as a witness, see Ballard, 855 S.W.2d at 560 (stating that the "purpose of determining competency of the witness in child sexual abuse cases is to allow a victim to testify if it can be determined that the child understands the necessity of telling the truth while on the stand"). The defendant is not entitled to relief on this issue.

In a related issue, the defendant contends that the trial court "may have" erred by asking the victim, "[W]here is God?" He claims that the question violated Rule 610 of the Tennessee Rules of Evidence. That rule provides as follows:

> Evidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature the witness's credibility is impaired or enhanced.

Tenn. R. Evid. 610. The Advisory Commission Comments note that the rule "prohibits any use of religious beliefs either to impeach or enhance a witness's credibility." Id., Advisory Commission Comment. In this case, the record establishes that the question was not intended to enhance or impugn the credibility of the victim but instead was designed to establish the victim's competence to testify. In our view, this issue is not a basis for relief.

The defendant also complains that the victim's testimony was irrelevant and that he was prejudiced by her mere presence as a witness. Relevant evidence is that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable" than it otherwise would be. Tenn. R. Evid. 401. Generally, all relevant evidence is admissible. Tenn. R. Evid. 402. At the discretion of the trial court, however, relevant evidence may be excluded if it presents a danger of unfair prejudice:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues,

or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Tenn. R. Evid. 403. This court will not reverse the trial court absent an abuse of discretion. See State v. Stout, 46 S.W.3d 689, 700 (Tenn. 2001).

Here, the victim's testimony established that the defendant hurt her and that, in consequence, she had to get medical treatment. This testimony was relevant, as it made more probable the fact that the defendant was the source of the injuries. In our view, the trial court did not err by permitting the victim to testify.

### III

The defendant next asserts that, under the terms of the 1989 Sentencing Act, the sentence is excessive. When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see State v. Jones, 883 S.W.2d 597, 600 (Tenn. 1994). "If the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls." State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

The presumptive sentence for rape of a child, a Class A felony, is the midpoint within the range if there are no enhancement or mitigating factors. Tenn. Code Ann. § 40-35-210(c). If there are enhancement factors but no mitigating factors, the trial court shall set the sentence at or above the presumptive term. Tenn. Code Ann. § 40-35-210(d). If there are mitigating factors but no enhancement factors, the trial court shall set the sentence at or below the presumptive term. Id. A sentence involving both enhancement and mitigating factors requires an assignment of relative weight for the enhancement factors as a means of increasing the sentence. Tenn. Code Ann. § 40-35-210(e). The sentence should then be reduced within the range by any weight assigned to the mitigating factors present. Id.

At the sentencing hearing, Dr. Janet Drake, a gynecologist oncologist, testified that the victim was diagnosed with "a pre-invasive condition of the vulva which is associated with transmission of human papilloma virus or the virus that causes genital warts." Dr. Drake stated that because this is

a precancerous condition, the victim will require examinations every three months for the rest of her life. According to Dr. Drake, the victim is too frightened to permit a thorough examination; thus, she must, at least for the time being, be placed under general anesthesia, which has associated risks. Dr. Drake noted that during her last examination, the victim suffered a "bronchial spasm," which required the use of a ventilator until her lungs were able to "open up." According to Dr. Drake, the victim's disease is "a lifelong condition because there's no way to eradicate the virus." She stated that the disease places the victim at risk for both cervical and vaginal cancer. It was her opinion that the victim "could very well go on to develop" either cervical or vulvar cancer. Dr. Drake described both types as "life-threatening."

Jerry Owens, Jr., the victim's step-father, testified that the victim was "fun-loving" and "energetic" until the time of the offense. He stated that since then, the victim had become reclusive and was unable to interact well with men. According to Owens, the victim suffered from nightmares one or two nights a week.

In arriving at a sentence of twenty-five years, the trial court applied two enhancement factors: (1) that the defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range and (2) that the personal injuries inflicted upon the victim were particularly great. See Tenn. Code Ann. § 40-35-114(2), (7) (2003).

The defendant does not contest the application of the enhancement factors but claims that the trial court erred by failing to consider as a mitigating factor that he cooperated in his statement to Investigator Rice. The record establishes that when asked about the application of the enhancement and mitigating factors, defense counsel replied, "Both the state and the defense knows the mitigating circumstances." The defendant never asserted that the trial court should consider as mitigation his cooperation with the police. Moreover, the record establishes that at trial the defendant denied making the statement to Investigator Rice. Under these circumstances, it is our view that the trial court did not err by failing to cite the statement as a mitigating factor.

IV

Finally, the defendant has asked this court to review the sentence under the reasoning of Blakely. Initially, the state contends that the defendant's Blakely claim is waived because it was not raised in the trial court. Recently, however, in State v. Chester Wayne Walters, No. M2003-03019-CCA-R3-CD, slip op. at 21 (Tenn. Crim. App., at Nashville, Oct. 4, 2004, as corrected Dec. 10, 2004), this court rejected the state's position:

> We acknowledge that Blakely extended Apprendi's holding that, under the Sixth Amendment, a jury must find all facts used to increase a defendant's sentence beyond the statutory maximum. However, nothing in Apprendi suggested that the phrase "statutory maximum" equated to anything other than the maximum in the range. To the contrary, the United States Supreme Court stated the issue in Apprendi as "whether the 12-year sentence imposed . . . was permissible, given that it was above the 10-year maximum for the offense charged in that count." 530 U.S. at 474,

120 S. Ct. at 2354. We also note that the Supreme Court has considered the retroactive effect of the holding in Ring v. Arizona, 536 U.S. 584, 592-93, 122 S. Ct. 2428, 2435 n.1, 153 L. Ed. 2d 556 (2002), as a new rule for capital cases even though it was based on Apprendi. See Schriro, ___ U.S. at ___, 124 S. Ct. at 2526-27. Perhaps this resulted from the fact that Ring overruled a case that had held the opposite. See Walton v. Arizona, 497 U.S. 639, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990). In this regard, with our own supreme court expressly approving our sentencing procedure under Apprendi, we have a difficult time faulting a defendant in Tennessee for not raising the issue before Blakely. We conclude that Blakely alters Tennessee courts' interpretation of the phrase "statutory maximum" and establishes a new rule in this state. The defendant's raising the issue while his direct appeal was still pending is proper.

In any event, even if Blakely did not establish a new rule, the United States Supreme Court in Apprendi stated that the defendant's right to have a jury find facts that increase his sentence above the prescribed statutory maximum is rooted in his Fourteenth Amendment right to due process and his Sixth Amendment right to a jury trial. 30 U.S. at 476, 120 S. Ct. at 2355. In State v. Ellis, 953 S.W.2d 216, 220 (Tenn. Crim. App. 1997), this court held that although there was no common law right to waive a jury trial, Rule 23, Tenn. R. Crim. P., allowed a defendant to "waive a jury trial if the waiver is in writing and is knowingly executed." Absent a written waiver, "it must appear from the record that the defendant personally gave express consent [to waive a jury trial] in open court." Ellis, 953 S.W.2d at 221. Blakely, as an extension of Apprendi, also requires proof in the record that the defendant personally waived that right.

This reasoning is persuasive. The defendant's Blakely claim in this case has not been waived.

The United States Supreme Court's opinion in Blakely calls into question the continuing validity of our current sentencing scheme. In that case, the Court, applying the rule in Apprendi v. New Jersey, 566 U.S. 466, 490 (2000), struck down a provision of the Washington sentencing guidelines that permitted a trial judge to impose an "exceptional sentence" upon the finding of certain statutorily enumerated enhancement factors. The Court observed that "the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Blakely, 124 S. Ct. at 2537. Finally, the Court concluded that "every defendant has a right to insist that the prosecutor prove to a jury [beyond a reasonable doubt] all facts legally essential to the punishment." Id. at 2543.

Under the rule established in Blakely, any prior convictions may be used to enhance a sentence. The defendant has three prior convictions for possession of cocaine, one of which was a felony offense. He also has convictions for possession of drug paraphernalia, petty larceny, trespassing, and possession of marijuana. The other enhancement factor applied by the trial court, factor (7), is not based upon prior convictions and was not admitted by the defendant. In

consequence, the holding in <u>Blakely</u> would preclude its application. Under the rationale of <u>Blakely</u>, which controls, the sentence must be modified to twenty-three years, at 100% service. <u>See</u> Tenn. Code Ann. § 39-13-523.

Accordingly, the sentence is modified to twenty-three years. The judgment is otherwise affirmed.

_____
GARY R. WADE, PRESIDING JUDGE